Good morning, Your Honors. May it please the Court, Roger Lewis for the Appellant Plaintiff Relator 3729, LLC. I'd like to reserve four minutes for rebuttal if I may. The purpose of the Public Disclosure Rule of the False Claims Act is to protect the government from having to pay rewards to opportunistic plaintiffs who come forward with copycat information drafting off what is already publicly known, not adding anything of value of their own, and seeking an unearned bounty. The text of the rule fits neatly with that purpose. But that is not this case, Your Honors. Relators' allegations do not derive from an Army Times article or a comment within an administrative rulemaking. They derive instead from information learned independent of those sources by relators' principals, one of whom was a true insider, the pharmacist in charge, at the very place and time of express scripts fraud. A years-long fraud, Your Honors. The complaint alleges a deliberate scheme to flagrantly and persistently over-refill prescriptions. That was not disclosed to the public sources, neither that there In short, as this Court said in Metesky, quoting the Supreme Court in Graham County, this is a case where the relator is one of those whistleblowing insiders with genuinely valuable information, rather than an opportunistic plaintiff. Let me start with the Army Times article and the DoD rule, which form the public sources, and issue the Army Times article being the primary one. In that article, the reporter is reporting on a Department of Defense report that had reported that express scripts program was saving the government money. And the report had disclaimed any evaluation of waste, and it claimed that there was no data provided by express scripts about waste. So the reporter went out and reported on whether there might be waste in the program. That's the title of the article. What do you see as the purveyment of the alleged fraud? What's the core of it? Is it the 67% supply rule, or what was it? It was the flagrant and persistent over-refilling, using a cadence of refilling 90-day scripts every 60 days ad infinitum, or every 20 days for 30-day scripts. That's right. It wasn't just one time. But if you describe that at sort of a very high level, then you're getting closer to what's in the public domain. It's when you get to the level of what were specific practices that drove it that that seems to be where the issue is. We wouldn't agree that the public domain has anything about a scheme, anything about this of one retired sergeant who did report that his scripts were being refilled on that cadence. But nothing in that source indicated that this was pervasive. I was going to say, reading beneficiaries, plural, with up to a year's worth of drugs piled in medicine cabinets and living closets. So I certainly get your point that they cite one person who complains about the particular every 60 days, a 90-day supply. But there is a broader reference, too, that isn't purely a one-off. There are other beneficiaries that have lots of extra drugs in their cabinets. Or perhaps the article is not specific, and it is an article about waste. It's not even an article about this particular kind of waste. In fact, the very first sentence of the article seems to have nothing to do with this issue. It reads, a Pentagon report says the contractor that manages Tricare's pharmacy benefit may be wasting money by continuing to ship drugs to beneficiaries who no longer need them or dispensing 90-day instead of 30-day prescriptions. So you say they're dispensing 90 days instead of 30-day prescriptions. That's not our issue. You come in with a prescription. It's a 30-day prescription with multiple refills in the pharmacy, and the customer decides let's obviate the need for you to come in three times during the next three months. We'll give you a 90-day supply. It's understandable that they make that choice, and it's also understandable that there might be waste if the customer doesn't wind up needing all 90 days. That's not our issue. It is true that the retired sergeant talks about the refill cadence that appears to be in our complaint, but there is no suggestion that it's pervasive, flagrant, or persistent. And that's the fraud. That's the scheme. And from our inside point of view, we have a principal who was the pharmacist in charge. Not only was it flagrant and persistent, it was hard-coded into the algorithm of the system to do this every time for every beneficiary. What's hard-coded specifically into the code? That every 90 days, that the first refill would be provided on the 60th day, and thereafter, every 60 days, even though 90 days of supplies were being provided each time. That was hard-coded. So the sequence, would that be 60, 120, or 60, 150? First refill at 60, second refill at 120, third refill at 180. And each time it's being refilled, it's going from two-thirds to actually less than. It's kind of moving back. Before very long at all, you have an extra refill that hasn't even been opened yet, and then you'll have two refills that haven't been opened yet, and it'll catch up. It never catches up. You would continually aggregate falling behind each time. That's right. Over and over for millions of beneficiaries and tens of millions of prescriptions. And, you know, that's beyond waste. When you're talking about an algorithm that was set at the highest levels of this company, and by the way, it was reset once. There was a merger, as we allege in the complaint, with Medco, and an opportunity to reset the algorithm. And our client's principal, the pharmacist in charge, said this would be an opportunity to change the algorithm. They didn't. They kept it exactly that way. The algorithm, what you're hitching your case on here, that was what was disclosed here. The algorithm itself was not disclosed at any public source. Excuse me. The Army Times article references a, I think, 2013 IG report. Is that in the record, or is that? I'm sorry. I think the Army Times article references a 2013 DOD IG report. I believe that is in the record. Yes. I had trouble finding it, but that's it. And if you read that, Your Honor, you'll find exactly what the reporter said, which is they disclaim having evaluated waste, and they say that Express Scripts did not have the data to report on it. And it's not just the algorithm, Your Honors, that differentiates our complaint from the Army Times article and the DOD rule. It is the fact that Express Scripts knew it was wrong. They knew it was wrong because they did it differently when they were on the hook for the money. They only did it this way for the government. When they were dealing with private payers and obligated to avoid waste in this particular way, they did it differently. They didn't refill on this cadence. And we're the only ones to allege that was nowhere in the article. Did they have a specific practice on cadence, or what was it in that context? In other contexts, it was all about usage. So when a refill was getting close to being used up, you'd send the next refill. And I don't know if it was 75% or some other percentage, but it wasn't set so that there would be no reference to the usage of the prior refill. It was set much more deliberately so that it would actually refill when needed. The first paragraph, the first sentence, the lead of the Army Times article says, Tricare's Pharmacy Benefit may be wasting money by continuing to ship drugs to beneficiaries who no longer need them or dispensing 90-day instead of 30-day prescriptions. I mean, the whole gist of it seems to be there. They don't use the word fraud, but, you know, we say you don't need to expressly use the word fraud. But, I mean, the implication here is something's amiss here. So, actually, I think that sentence is pretty telling. None of that appears to deal with the 90-60 issue. Instead, it's dealing with 90-30. That's not a refill cadence. That has to do with whether you come in. Sometimes you come in and want your 30-day script. So the paragraph, they quote the sergeant who says that, you know, I'm getting 90 supplies for 60 days. I mean, the gist of it seems to be there in the article. And they seem to be put on notice. Yeah, so, you know, the case law indicates that you can get to a public disclosure if, or you fall short of a public disclosure if you have provided some details, if the public disclosure has provided some details, but not an inference of a fraudulent scheme. So in the Metesky case, for example, and this court's decision from earlier this year, 2024, in the Valiant-Silbershire case are both sort of along those lines. You've got public sources that have grains of the allegations, but do not sort of put them together. Only the relator does that. And that's what's happened here, Your Honors. Do you want to address your alternative argument on original source? I do, Your Honor. And, actually, I think we think that that's the even more grievous error by the district court here. The district court ruled against us on original source, finding that we did not materially add any information to the public sources. And we've already discussed, to some extent, the material additions that we made that were rejected by the district court as being material. But they include the intent, the scienter element of the False Claims Act, which courts have recognized to be the gravamen of a False Claims Act case. There's nothing in the Army Times article or the DoD rule that goes to that. They also include, as I mentioned, the fact that they do it differently when they're dealing with private payers. The disclosures don't have anything to say about the customer complaints and how they're ignored or about the internal complaints raised by the pharmacist in charge and many others that we referenced in our complaint that were also ignored and discarded. The question about is a very unusual feature in the statutory language, because generally throughout the False Claims Act, it uses the term person. So it says in the public disclosure bar, you'd have to be dismissed if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed, and it lists the three requirements or alternatives rather, unless the action is brought by the attorney general or the person bringing the action as an original source of the information. But then you go to the definition, it says for purposes of this paragraph, original source means an individual who either, and then it goes on, 3729 LLC is not an individual. Individual means natural person. So I'm not, how do you fit that language? You know, I think if Congress had intended to make it impossible for a corporate relator to be an original source, it would have said it quite clearly. And we don't think that that is a clear demonstration. The case law from the Supreme Court is very clear that individual means natural person, unless in the rare case where it would be truly absurd not to include them. But here the difference in language between person and individual is quite striking, and knowing the difference between those, which is right in the Dictionary Act, 1 U.S.C. 1, the word shifts from person to individual, suggesting that Congress only was going to allow individual sources who were individuals. I mean original sources who were individuals. I understand the point, Your Honor, but if Congress had really wanted to do that, I think it would have made itself far more clear than that. It changes language. I mean that's a problem we have. You could argue they could have made it even clearer, but we can't disregard the fact they decided to use the word individual. Corporations have been relators for, you know, at least since the 86th Amendments of the Act, and I don't believe we've ever been recognized. Yes. The question here is whether you endorse the statute. That's right. Yeah. I'm going to have to look into that, and I'm going to use some of my rebuttal time, I think, for that. On the materially odd side, Your Honor, I think I've addressed that on the alternative argument that express scripts raise with respect to independence, which is the other aspect of original source that they rely on, but the district court did not. It is clear we think that independence does not have a temporal component. You don't have to have learned the information after the public source. In this case, we did. I mean the relator's principles learned, the facts underlying their allegations before the Army Times article and the DOD rule came out. But even if information is attributed to our ultimate relator, the corporation, as of the time it was formed, that independent knowledge transfers to it, and there's no temporal requirement, certainly under the modern act that would require them to have learned it before the public sources. And I think that's the gravamen of express scripts argument, and it finds no support. They refer to Amphistar and Devlin, two Ninth Circuit cases under the old rule, that simply indicate, in our view, that you can establish independence if you learned it. Certainly, it's an easy way to do it. You can establish independent knowledge if you learned it before the public sources, because, of course, if you learned it before, you couldn't have been informed by the sources. But an alternative way would be through an insider's knowledge, and that's what we have here, an insider who saw it independently. All right. I'm going to give you two minutes for rebuttal. Let's hear now from Mr. Sitarchuk. Did I get that correctly? Exactly right. All right. May it please the Court, Eric Sitarchuk for Ever North Express Scripts. The gravamen of relator's complaint, and it's right there beginning on page 3, paragraph 3, is that in administering the TRICARE mail order pharmacy program, Express Scripts shipped 90-day prescriptions every 90 days, and that resulted in beneficiaries receiving every 60 days. A day every 60 days. 90 days every 60 days. I'm sorry. I misspoke there. 90 days every 60 days. That resulted in beneficiaries getting an excessive and wasteful amount of medication. That is the gravamen of the complaint. It says it in a lot of different ways, but it says that very same thing over and over again. The only place where that is publicly in the materials that you have is this one fellow who's quoted in an article about the IG report, and the IG report doesn't mention that practice at all, but it's just the one quote. They ship 90-day supplies after 60 days. By the time I get 12 months into this, I have a non-month supply of drugs. That doesn't say that that wasn't just some goof-off in his one case, but now they've added that this is actually a practice. They've set the software precisely so that it will do it every 60 days. They don't do that for the non-governmental accounts, and they've done that precisely in order to churn out excess drugs and get the big billings. So let me address that in pieces, Your Honor. With respect to the first piece, what the Army Times article says, I think that one has to look at the entirety of the Army Times article and what that reporter did and then said, not what may have been behind the scenes. And what that reporter did and then said, as the article explains, is got information from a community pharmacy association. They get information from that DO-DIG report. Talked to a number of beneficiaries, and the conclusions that that reporter reached from what looks, from the face of the article, to be some very extensive work, was that Express Scripts was overfilling for beneficiaries, plural, that beneficiaries were piling up nine months' worth of prescriptions in their medicine cabinets. Where else in this article, other than that one quote that I read, do you see any further reference to this specific practice that is the purveyment of this action? You do not, Your Honor, other than that I would say this, which is the way the article phrases this, this is an example. This isn't a legal brief for a complainant. Your theory is essentially this reporter from the Army Times figured out what the DOJ, I mean the DOD Inspector General, failed to catch, which is that they have a fraudulent practice of differentially, you know, the algorithm to kick out every 60 days, and that that's out there based on this one quote from, you know, this retiree who says, I'm getting a lot of drugs. Your Honor, I wouldn't say that the DOD failed to catch it. The DOD had this Army Times, they saw it. But where in the IG report is there a reference to this, you know, the cadence issue? It's not in the IG report, Your Honor, but there are references under the record to the fact that the DOD gets these billings. They understand how many prescriptions are being billed at what cadence, and they did not voice any objections to that. Let me, I mean your point is that it's out in public. The IG report says nothing about it. The IG report says actually the overall program is a good deal, and is, you know, less than it might have been, although they said they didn't take some costs into account. But so the IG report has none of this in it, and then you just have one quote, and the whole fraudulent practice is out in the public to bar a false claims act based on the one quote. Well, it's one quote based on a beneficiary who cited the article as an example, but not just us trying to run medication, right? That's a beneficiary and his wife receiving 14 different medications in this way. That certainly suggests purposeful activity here. Yes, Your Honor. The difference between waste and fraud, if I could. The relators are alleging fraud. This was intended to pat the bottom line of the company. The article is more about waste, and you can see there could be more benign motives. You know, I mean, actually sometimes it may be useful to get extra pills because maybe you're on vacation and you want to take it for pills. You may have a pill bottle and knock it over. You know, we can knock over a water jug so, you know, it's easy to knock down pills. That's actually maybe a little bit more benign motive, and that'd be wasteful. I guess they're alleging something a little bit more nefarious of fraud. The public disclosure bar is very clear that it is based on either public disclosures of allegations of fraud or transactions from which the. . . Allegation of fraud. Your Honor, it doesn't. . . We'll have the transaction prompt there. And yet, this is based on an IG report, which is in the record at 326 something. . . And the title of that is the Tricare mail-order pharmacy program was cost efficient and adequate dispensing controls were in place. And that's certainly not. . . And indeed, in your answering brief, one of your arguments is that the complaint doesn't adequately allege scienter because scienter is required. And I look at that Army Times article, certainly the IG report, the subsequent DOD report, I see nothing suggesting that scienter was established, that this was a deliberate, intentional program by your client. That's the allegation we have in front of us here, and I don't see where that's been previously disclosed. Please point me to what you think previously discloses that there was scienter, that in fact this was conscious, deliberate conduct. Where is it? In this article itself, the statement conscious, deliberative conduct does not exist, but that is not required for a public disclosure. But you've got to give me enough transactions that you can get there. I don't see it. No, you do get there, particularly when you compare this to the complaint. Because this is not a complaint that alleges evidence of scienter, such as a bunch of executives sitting around, talking about how we're not allowed to fill this way. We know it's wrong. We're going to do it anyway, and we're going to falsely certify. This is a complaint that alleges scienter fundamentally on the idea that they did this on purpose. They filled the scripts in a wasteful way on purpose. I don't know why you mentioned that. It's different from what they were doing with other customers. Other customers? This was a specific pattern for this customer, the government, and not done for other customers. That's not hard to infer scienter. It was a deliberate act, and that's as I read the complaint. I don't think it was anything in there that says, oh, they did this by accident. They're saying it was deliberate conduct. That seems to satisfy scienter. And I don't see anything in the Army Times article or anything else you've identified that comes close to that level of explicit allegation of scienter. The question is, does the Army Times article create an inference of scienter, an inference of fraud? And I think it clearly does because as you read this. That one retiree, that could just be one individual screw-up. And then the later things you talk about, you can't get rid of the customer service. You know, they ruined that. But where is it that this is a general practice without any facts about it which you could infer that it was a general practice? The article talks about beneficiaries in the plural. So the reporter, unless he's making it up, but we don't want to take that. We have to take the article in its face. The article in its face talks about beneficiaries who are receiving wasteful amounts of medication. Beneficiaries, beneficiaries plural. You know, I noticed that myself because I asked your colleague the question, and I have trouble seeing how that tells me there's a universal problem that this is the practice of your client to automatically send out 90 days supply every 60 days. If this happens to more than one person, that's not the same. There is nothing in this article that suggests this was a whoops, that somebody collected the report themselves. This is based on the IG report which says in so many words adequate dispensing controls are in place. It's not just based on the IG report. It's based on information that was provided by an association of independent pharmacies who have every motivation to try to shake this loose from a big company like Express Press. But the reference to other beneficiaries in this article, it says beneficiaries with up to a year's worth of drugs piled in medicine cabinets and linen closets are wondering as well about, and that's referring to the paracetamol, about whether the home delivery system saves money. But that doesn't say whether it's due to the fact that they do 90 as opposed to 30, which was a topic of the IG report, and it's the lead paragraph in the article. So I don't see that there's a reference to other beneficiaries in this article that generalizes this gentleman's complaint. I don't think you need that granular level of matchup, and if you look at the cases that have looked at this question of whether, we're really talking about the question of substantial similarity, but it's a material answer. If somebody, if there's an article that says that, you know, this company overbilled me by $100 and that comes out publicly, that would bar a false claims act suit where the allegation is that the contractor deliberately has set the software that everyone gets overbilled $100. That's not this case, sir. How is that not this case? This is one anecdote of somebody who had something happen to him, and you don't, that's all it says. And they've now said that this was not an accident. This one little anecdote is actually how the whole system is structured. This article talks in plural terms with multiple beneficiaries about beneficiaries receiving excessive medication, more medication than they needed, beneficiaries having medication piling up in their file cabinets. The fact that it says 90-60 is an added level of granularity, but it's not a level of granularity that the case law requires for it to be either substantially similar or under the material ads, because what you have here is, in its essence, a fraud case that's saying Express Scripts is excessively overfilling, and the government is paying for it. That's the gravamen of the fraud. That's what this article says in a multitude of ways. When it gets to the 90-60, if that wasn't there and it just said it was excessively filling prescriptions, that would be good enough. That would get you your substantial similarity and your material ads issues. So our position, Your Honor, is that the gravamen of the complaint is excessive filling that the government is paying for, beyond what the beneficiaries need. And this article says that in a variety of ways, and it uses an example, which articles do, they'll use examples, of one way in which that happened. And not only once with respect to that example, 14 medications, 2 beneficiaries. That suggests purposeful overfilling, and purposeful overfilling is really all the complaint suggests. Maybe I'm reading too much into it. It seems like you're suggesting maybe we should read newspaper articles slightly different from other public disclosures because journalism is driven by anecdotes, and often anecdotes are reflecting something, a broader trend, as opposed to some report by someone which they'll speak in more general terms and more absolute terms, whereas newspaper articles, they like stories, they like color, that's what editors want. So you're saying these couple of anecdotes really reflects a broader trend. That's exactly right, Your Honor. Is there any case law that says that? I haven't seen any case law that says that, but there is ample case law that talks about public disclosures based on newspaper articles. But those newspaper articles don't come right out and say it's fraud or say it's intentional. Because there are lawyers who are there who will prevent journalists from saying that. And the government in looking at this, there's certainly more than enough here to put them on notice. There could be a problem. If we think this is an issue, we ought to take a look at it. You're in an opposition forced by the law that you're busy arguing that the world was told years ago that your client was defrauding the government. You don't need to acknowledge that that fact was true, but you're stuck saying it was sufficiently disclosed. My problem is that if the reporter for this article, Arby Times, knew or inferred or figured out from the evidence he had and the interviews he'd conducted that in fact your client was defrauding the government as a matter of intent to the tune of millions of dollars a year, that probably would have been the lead of the article. And that wasn't the lead of the article, and it's never explicitly stated in the article. So why should we make the leap the urging is to make when in fact that's not what the article would have revealed? And if they had that scoop, I think that would have been right on top front page. Because that is nowhere close to what's required for a public disclosure, for the application of a public disclosure bar. All that is required for the application of a public disclosure bar is enough of the material facts to be out there in the public domain to put the government on notice. If there's an issue here, it may want to investigate. My law firm decided to survey everybody else in our office to see how they read this. Nobody read it with the allegation that this was an intentional plan and barked on by your client to sell a lot more pills. So I see maybe you can read the tea leaves in a certain way to reach that conclusion, but I don't think many people are going to read it that way, and so I don't think you had a good argument for saying it satisfies public disclosure. I think the question is, Your Honor, is there a reasonable inference that can be drawn from this that this was purposeful? And given the way that the article describes its sources, well beyond the IG report, anecdotal examples of what happened, and waste in sweeping terms, that that's more than enough to infer purposeful behavior here. That puts the government on notice. That meets the substantially similar test. That makes it a public disclosure. There's nothing more in the complaint that materially adds to that, but I'd like, if I could, to use my last 30 seconds to talk about the independent question that was raised. You're actually over, but I'll let you finish. So one way in which, and we're now into the original source exception. One way in which the original source exception, that it requires, is that the knowledge of the relator be independent of, under the old act, the information that was the basis of the allegations, under the new act, independent of the public disclosure itself. The case law in this circuit is clear. In order for that independence prong to be met, the knowledge of the relator has to exist, the relator has to have the knowledge before the public disclosure. Devlin, FSR, case after case says that. Here, the relator did not have that knowledge before the public disclosure, because the relator did not even exist before the public disclosure. And you can't know something when you don't exist. Now, is the knowledge of the persons who are in the LOC attributable to the LOC for those purposes? Only if they gain that knowledge while they're acting in the course and scope of their employment, and we cite cases for that proposition. It's black letter California agency law. And in addition, even the restatement, which I think goes broader than California law, and says that if they acquire it before, if they use it within their act and scope, at that point it's imputed to the corporation. But since this company only exists after the public disclosure, it only becomes its knowledge at that time. And that's after the public disclosure and not before, and that's why it can't be independent of based on long-standing law of this circuit. And the change in the law actually supports this circuit's views, because what the change in the law does is it ties the knowledge directly to public disclosure. So it makes it even more clear that the knowledge has to be independent of the public disclosure. This court has drawn a bright line, therefore it has to be before the public disclosure. Thank you. It's a little bit different here, again, because it's a separate new entity, but the member is the pharmacist in charge who has that information. Maybe there's a distinction if it involved a company that was just formed to collect tips. It's kind of a so-called patent-type troll in the arena. You can maybe say that, but here it seems like, again, that the pharmacist in charge is the guy who founded this, started this. And if he had brought this suit at an earlier time, he could have met the other problem of the original source exception, and we wouldn't even be here. But they chose to wait, and they chose to do it this way, and that means the knowledge only existed as of the time of formation, and because the knowledge only existed as of the time of formation, it couldn't have existed before the public disclosure. Thank you. Thank you, counsel. We'll hear a rebuttal from Mr. Lewis in two minutes. Thank you. Just a couple of brief points. We talked a bit about the 2013 audit and what it did and didn't say and what it could and couldn't find. It didn't find any of this waste because that waste was kept from it. In fact, the pharmacist in charge in our complaint alleges that he was part of that audit team that was responding to the government's audit, and they specifically kept from the government during that audit process the algorithm and the cadence of their refills, the fact that they were refilling too much. And that was kept from the DOD during that audit. It's paragraphs 94 to 105. Subsequent audit in 2015, same thing. The complaint alleges that Express Scripts Senior Management decided to obfuscate and not to divulge the existence of this algorithm and how they were over-refilling scripts. We certainly agree with Your Honor's observations about waste being fundamentally different from fraud. There's waste all the time. These are big government programs. If waste was a signal to investigate fraud every single time, there'd be fraud. Investigations going at every level of government way too much to make any sense. That's right, Your Honor, and I was one once as well. I did want to- What is the issue of the knowledge point that he, your- Independent knowledge, yes. Closed with. Yes, and I also want to address Your Honor's very interesting point about individual and person before I leave. With respect to independence and knowledge, and especially for a corporate relator, Your Honor, corporate law actually provides at one of the restatement sections that the corporation invested with the knowledge of its employees that are within the scope of its employment, even if that knowledge was acquired before those employees became associated with the corporation. So within the scope of this relator, this LLC, was bringing this lawsuit, filing this complaint, making these allegations. They used all the information that they obtained from the pharmacist-in-charge member, and they made the allegations that it was within the scope and certainly falls within the independence section. Your Honor, with respect to the wordsmithing in- and by the way, it's both the old act and the new one, has this new one. So if we had not observed, and I actually don't think it was brought to the Court's attention by express script, so I don't know whether it's a waiver or not, but we'll address it. The lead-in to the paragraph defining original source states that the Court shall dismiss an action unless opposed by the government if substantially the same allegations or accusations as alleged were publicly disclosed, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information. And then it goes on to define original source separately and uses the word individual at that point. And we don't know if that's a scrupulous mistake, but there's certainly no- given the fact that person is specifically referenced in the lead-in sentence to being eligible to be an original source, it can't mean that an original source has to be only an individual. Because it uses person throughout the rest of the statute, and then when it gets there, the person has to meet the definition, and then the definition has to be an individual. It could be that it means within the context of a corp- obviously an individual has knowledge. Even a corporation's knowledge is derived from its individuals. So to the extent that there's a corporate relater, and again, this language has been there since at least 1986, and it's been interpreted this way in a way that's consistent with our view. So do we have a case in which we've ever recognized a corporate entity as an original source? Ninth Circuit? Yes. I don't know off the top of my head, Your Honor. All right. Thank you, counsel. The case just argued is submitted and we will stand adjourned. All rise. Hear ye, hear ye. All persons having had business with the accountable to the United States Court of Appeals for the Ninth Circuit will now depart for this court, and this session ends adjourned.
judges: CLIFTON, COLLINS, LEE